**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **v.** | : | **CRIMINAL NO. 25-318** |
| **AMARA DUKULY** | : | |

# GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by its attorneys David Metcalf, United States Attorney for the Eastern District of Pennsylvania, and Robert J. Livermore, Assistant United States Attorney, respectfully represent as follows:

## I. INTRODUCTION

Defendant Amara Dukuly was an immigration officer who took an oath to faithfully discharge his duties. Instead, he abused his position to exploit immigrants for his own pecuniary benefit. After pleading guilty to one count of accepting a $6,000 bribe, in violation of Title 18, United States Code, Sections 201(b)(2) and 2, the defendant is scheduled to be sentenced on October 1, 2026, before the Honorable John M. Younge. The applicable guideline range for the count of conviction is 6 to 12 months in prison. For the following reasons, the government recommends that the Court impose a sentence within that range given Dukuly's serious offense conduct.

## II. FACTS OF THE CASE

Over the years, the pertinent law enforcement authorities received information that Amara Dukuly, an immigration officer with United States Citizenship and Immigration Service, solicited bribes in exchange for assisting individuals with their immigration situations. The FBI

and the Department of Homeland Security thereafter initiated a criminal investigation into Dukuly. As part of that investigation, two individuals (Individual #3 and Individual #4) recorded conversations with Dukuly on behalf of the criminal investigators.

On March 26, 2025, Individual #3 introduced Individual #4 to Dukuly so that Individual #4 could explain his immigration status to Dukuly because Dukuly was known to work on immigration matters. Dukuly informed him that he was a fraud investigator in the national security field. Dukuly said he could get someone to help Individual #4 with his immigration status. Dukuly also said that helping Individual #4 would be "expensive," he did not know how much, and he would have to talk to someone. Dukuly further stated that it would be a process and "someone can go to jail for their lifetime for this. You cannot mess with this kind system. You get me?"

Later during the meeting, Dukuly told Individual #4 that the price would be $12,000 and could be paid in installments. At the conclusion of their meeting, Dukuly agreed to meet Individual #4 on April 4, 2025, to receive the first installment of $6,000 cash.

On Friday, April 4, 2025, Dukuly met Individual #4 in Delaware County, Pennsylvania. The meeting was audio and video recorded. During the meeting, Dukuly discussed the terms of their deal, which included Individual #4 paying Dukuly $6,000. Dukuly said that the $6,000 was not for him but was for the people Dukuly recruited to help Individual #4. Dukuly explained that he had people who would help by clearing Individual #4's record of the label "terrorist," an automatic disqualification and he had to pay these people to clean the record. Dukuly added, "The people said $12,000 … Me? I should have come to you and said . . . 20,000 . . . 18,000. But I'm not doing that." Dukuly expanded on what was going to happen next, saying "Now, what

they're going to do for you, the government think you terrorist… Now, you terrorist, they don't give papers to terrorists here… These people are going to work the system, manipulate, take 'terrorist' off…. Make you regular." Dukuly repeated the word "clean," then said, "They're going to make it clean then you're going to go through the regular process."

Dukuly claimed, "What I'm doing, if it is not my biological brother, I don't do it for nobody. . . . This thing I'm doing, I get paid very well. I don't need nothing from no one . . . But you can't be somewhere you can't help your brothers." Dukuly added, "They're going to take you off terrorist stuff. Big problem, terrorist. And, over there, coming through the border is not good. . . . When you finish everything…you want to give me appreciation, you can do that, that's up to you." Dukuly explained, "It's not that these people going to take green card and give it to you. They're not doing that… They put you on a terrorist watch. They call you a terrorist, so on the day of your court, the judge will not even want to talk to you. They're going to deny you because they think you terrorist… But you are not, so these people are going to take you from all of that, and put you in regular. Now when you go, you'll be able to see the judge and push your case to the judge. Then you have 90% chances of getting your papers. Versus you not talking to the judge at all and they say 'we don't want to talk to him. He's a terrorist. We want deport him."

Dukuly repeatedly emphasized that he was not getting Individual #4 "papers," but, he said, "Me fight hard. Fix inside. Clean. With these people, clean." Dukuly then coached Individual #4 about how to talk to the immigration judge and explained what would get him "papers."[1]

---

[1] In the context in which Dukuly used the word "papers," the evidence shows that his

*continued . . .*

Dukuly addressed the payment schedule, saying, "Now, these people said they will do their work from now 'til June. They want the second phase of their money, 25%, in June. June, you get 3,000…. Next time, you and I will pay the balance later." At that time, Individual #4 handed Dukuly $6,000 in cash. Image 1, below, is a screenshot of the cash Individual #4 handed to Dukuly.

Image 1



Images 2 and 3, below, show DUKULY putting the cash into his pants pocket.

---

reference to "papers" meant official documents that would allow Individual #4 to live and work in the United States.

Images 2 and 3



After Dukuly accepted the $6,000 cash, he informed Individual #4 that he was going to fight hard for him. Dukuly added that he was not keeping any of the money and that, on Monday, he would give it to the other people he was working with who would remove Individual #4 from the terrorist list. Dukuly said he would give the money to the people and implied that everything would be done by June. He also said, “She got all your information. . . so she’s working on it from now to June. . . her finish.” Finally, Dukuly told Individual #4, “Don’t say this to no one. Don’t- Don’t tell lawyer. Don’t tell lawyer that you got someone helping you . . . you understand?... Don’t tell lawyer.” Dukuly reiterated that no one, including Individual #4’s lawyer, should know. Dukuly then exited Individual #4’s vehicle with the payment he received from Individual #4.

Finally, Individual #4 would have testified that after paying Dukuly on April 4, 2025, he learned from Individual #3 that Dukuly wanted to have another meeting with Individual #4 to collect another installment payment.

## III. Sentencing Guidelines

The government agrees with the Presentence Report that the guidelines recommend a sentence of 6-12 months in prison.

## IV. Sentencing Factors

A sentencing court follows a two-step process, first calculating the range under the Sentencing Guidelines, and then considering that range along with all pertinent 18 U.S.C. § 3553(a) factors in determining the appropriate sentence. *See* USSG § 1B1.1 (Nov. 1, 2025).

At the second step of the sentencing process, "[t]he record must demonstrate the trial court gave meaningful consideration to the § 3553(a) factors. . . . [A] rote statement of the § 3553(a) factors should not suffice if at sentencing either the defendant or the prosecution properly raises 'a ground of recognized legal merit (provided it has a factual basis)' and the court fails to address it." *United States v. Cooper*, 437 F.3d 324, 329-30 (3d Cir. 2006) (citations omitted). *See also Rita v. United States*, 551 U.S. 338, 356 (2007) ("The sentencing judge should set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority."); *United States v. Flores-Mejia*, 759 F.3d 253, 256 (3d Cir. 2014) (en banc) ("Failure to give 'meaningful consideration' to any such argument renders a sentence procedurally unreasonable which, when appealed, generally requires a remand for resentencing.").

The Supreme Court has declared: "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). "These requirements mean that '[i]n the usual sentencing, . . . the judge will use the Guidelines range as the starting point in the analysis and

impose a sentence within the range." *Peugh v. United States*, 569 U.S. 530, 542 (2013) (quoting *Freeman v. United States*, 564 U.S. 522, 529 (2011) (plurality opinion); ellipsis in original). "Common sense indicates that in general, this system will steer district courts to more within-Guidelines sentences." *Peugh*, 569 U.S. at 543. "The federal system adopts procedural measures intended to make the Guidelines the lodestone of sentencing." *Id.* at 544.

In addition, this Court must also consider all of the sentencing considerations set forth in Section 3553(a). Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).

**1. The nature and circumstances of the offense**

In this case, Amara Dukuly engaged in serious criminal activity and betrayed the trust placed in him as an immigration officer. An immigration officer is expected to enforce the law. This defendant turned these responsibilities on their head by taking bribes from immigrants purportedly to assist them evade the law. The two individuals referenced in the indictment and offense conduct were not the only immigrants from whom Dukuly solicited bribes. As described

in more detail in the Criminal Complaint, numerous immigrants had filed reports alleging that Dukuly solicited bribes from them. The evidence suggests that Dukuly's conduct was not an isolated incident but a pattern of conduct on his part over a number of years.

Perhaps the most egregious part of Dukuly's criminal conduct is the fact that there is no evidence that Dukuly or anyone else took any action to assist Individual #4 or any of the other alleged victims. This evidence suggests that Dukuly took advantage of these desperate individuals by accepting bribes from them with a promise to assist them with their immigration situations. Rather than help them as promised, Dukuly simply pocketed the money knowing that the victims would likely be deported. As a result, most of the alleged victims have been deported from the United States leaving them with little recourse for Dukuly's deception. At a time when the actions of immigration officers are being scrutinized by many, Dukuly's actions undermined the integrity of the immigration system.

**2. The history and characteristics of the defendant**

Like his victims, Dukuly is also an immigrant to the United States. Dukuly grew up in war-torn Liberia. He emigrated to the United States as a teenager and joined the U.S. Army where he honorably served in combat in Iraq. After an honorable discharge in 2015, he joined the U.S. Citizenship and Immigration Service (USCIS) as an immigration officer. He has no prior criminal record.

**3. The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense**

In this case, there is a strong need to promote respect for the law and provide just punishment for the offense. It is of paramount importance to the United States that our

immigration laws be faithfully implemented. Dukuly was willing to betray his oath of office to assist a "terrorist" get a "clean" record and receive status in the United States. A sentence within the recommended guideline range is necessary to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.

**4. The need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant**

This Court's sentence must account for both specific and general deterrence. Our immigration system cannot tolerate corruption of any stripe, particularly not the type of misconduct here. While the vast majority of immigration officers perform their duties with integrity, there certainly are those who are tempted to use their position to solicit bribes as the defendant did here. To deter such crimes, the consequences must be significant. A sentence within the recommended guideline range will properly send the message to this defendant and others that the consequences for those who engage in official misconduct will be severe.

**5. The need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner.**

The government is not aware that the defendant requires any such training or treatment.

**6. The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.**

In this case, the government is not aware of any defendant similarly situated to this defendant. A sentence within the sentencing guideline range will ensure that the defendant is sentence similarly to other defendants with similar conduct and similar criminal records.

## IV. CONCLUSION

The defendant accepted a $6,000 bribe to help a "terrorist" to gain immigration status here in the United States. This conduct is completely unacceptable. The government recommends that the Court impose a sentence within the sentencing guideline range of 6 to 12 months in prison followed by three years of supervised release. As the defendant has the means to pay a fine, the Court should also impose a fine within the guideline range of $4,000 to $40,000 and order forfeiture of the $6,000 for the bribe the defendant accepted.

Respectfully submitted,

DAVID METCALF
United States Attorney

*/s/ Robert J. Livermore*
ROBERT J. LIVERMORE
Assistant United States Attorney

**CERTIFICATE OF SERVICE**

I hereby certify that this Sentencing Memorandum has been served on the Filing User identified below through the Electronic Case Filing (ECF) system:

Abigail B. Gustafson, Esquire
agustafson@mtvlaw.com

*/s/ Robert J. Livermore*
ROBERT J. LIVERMORE
Assistant United States Attorney

DATED: September 9, 2026.